**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ADRIAN JIM, on behalf of himself and others
similarly situated,

   Plaintiff,

vs.             No. CIV 20-0618 JB/JFR

CORECIVIC OF TENNESSEE, LLC,

   Defendant.

**MEMORANDUM OPINION[1]**

   **THIS MATTER** comes before the Court on the Defendant's Motion to Transfer, filed November 16, 2020 (Doc. 26)("Motion"). The Court held a hearing on December 22, 2020. See Clerk's Minutes, filed December 22, 2020 (Doc. 38). The primary issue is whether the Court should transfer this case to the United States District Court for the Middle District of Tennessee, because the Plaintiff's counsel filed an action making similar allegations against the same Defendant in the Middle District of Tennessee. The Court concludes that it should not transfer this case, because: (i) the first-to-file rule does not govern this case, because the case presents a different controversy with different parties than the case in the Middle District of Tennessee; and (ii) the discretionary factors governing change of venue under 28 U.S.C. § 1404 do not weigh in favor of transferring, because Jim filed this case in the United States District Court for the District

---

[1]In the Court's Order, filed September 13, 2021 (Doc. 40), the Court denied the Defendant's Motion to Transfer, filed November 16, 2020 (Doc. 26). In the Order, the Court states: "This Order disposes of the Defendant's Motion to Transfer, filed November 16, 2020 (Doc. 26). The Court will issue a Memorandum Opinion at a later date fully detailing its rationale for its decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

of New Mexico, and Defendant CoreCivic of Tennessee, LLC, does business in New Mexico.  The Court, therefore, denies the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Plaintiff's Original Class Action Complaint, filed June 25, 2020 (Doc. 1)("Complaint"), the Motion, the Defendant's Brief in Support of its Motion to Transfer, filed November 16, 2020 (Doc. 27)("Supporting Brief"), and the Plaintiff's Response to Defendant's Motion to Transfer Venue, filed December 8, 2020 (Doc. 31)("Response").  The Court supplies a factual background to assist the parties in knowing what facts the Court uses for this Memorandum Opinion, not to state these facts for their truth.  These facts do not bind the parties or the Court at trial.  The Court recognizes that the factual background largely reflects Jim's version of events.

Until 2019, Jim worked in New Mexico as a correctional officer for CoreCivic Tennessee, a company that operates private prison services nationwide.  See Complaint ¶¶ 11-12, at 3.  As a correctional officer, Jim was tasked with helping to manage and oversee the inmate population at CoreCivic Tennessee facilities.  See Complaint ¶ 13, at 3.  Correctional and detention officers, like Jim, are "responsible for the custody and discipline of inmates and detainees held at correctional and detention centers operated by" CoreCivic Tennessee.  Complaint ¶ 13, at 3.  Correctional and detention officers also are tasked with searching for contraband, providing security, and counting, feeding, and supervising detainees and inmates.  See Complaint ¶ 13, at 3.

Every time Jim and other corrections officers arrive at work, they undergo a thorough screening to ensure they are not bringing prohibited items into the facilities.  See Complaint ¶¶ 15-20, at 3-4.  Correctional officers have to empty their bags and pockets, remove their shoes, belts, and jackets, take off all metal objects, and hand over their personal items for inspection.  See

Complaint ¶ 16, at 3-4.  After shedding items for search, correctional officers walk through a metal detector and undergo "a further search if any metal objects were detected."  Complaint ¶ 17, at 4. Once cleared, correctional officers then must put back on their shoes, belts, and jackets, and replace all personal items.  See Complaint ¶ 18, at 4.  Last, before correctional officers can clock in to work, they must pass through several security doors.  See Complaint ¶ 19, at 4.  The entire security screening process lasts between ten and twenty minutes.  See Complaint ¶ 20, at 4.  Although CoreCivic Tennessee requires these security screenings, tells correctional officers -- including Jim -- when to arrive at the prison centers, and although these security screenings are necessary for the prisons' safety and security, as well as the safety and security of the correctional officers and their work, CoreCivic Tennessee does not compensate Jim or other correctional officers for this time. See Complaint ¶¶ 20-26, at 4-5.

On February 25, 2020, Jim's counsel, on behalf of other CoreCivic Tennessee employees, sued CoreCivic Tennessee in the United States District Court for the Northern District of Ohio, alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 203 ("FLSA"), and Ohio's minimum wage laws.  Supporting Brief at 2.  Several weeks later, on March 12, 2020, again on CoreCivic Tennessee employees' behalf, Jim's counsel sued CoreCivic Tennessee in the United States District Court for the Western District of Oklahoma and in the United States District Court for the District of Colorado, also alleging FLSA violations.  See Supporting Brief at 2.

CoreCivic Tennessee moved to transfer the Northern District of Ohio case to the Middle District of Tennessee, where CoreCivic Tennessee is headquartered.  See Supporting Brief at 2-3. CoreCivic Tennessee intended to file similar motions to transfer the Western District of Oklahoma and District of Colorado cases to the Middle District of Tennessee.  See Supporting Brief at 3. Rather than oppose CoreCivic Tennessee's motions to transfer, however, Jim's counsel "stipulated

to the dismissal [of] each of these cases without prejudice, in order to consolidate the plaintiffs and their claims into a single lawsuit in the Middle District of Tennessee." Supporting Brief at 3. On May 15, 2020, all the claims that were alleged in the Northern District of Ohio, Western District of Oklahoma, and District of Colorado cases were consolidated, and pleaded as a single action against CoreCivic Tennessee in the Middle District of Tennessee. See Supporting Brief at 3; Ballard, et al. v. CoreCivic of Tennessee, LLC, No. 3 CIV 20-0428 (M.D. Tenn. May 15, 2020)("Ballard"). Ballard contains two causes of action for unpaid overtime wages, in violation of the FLSA and Ohio's minimum wage laws. See Supporting Brief at 3. The parties stipulated to a FLSA collective action defined as:

> All current and former Correctional Officers, Senior Correctional Officers, Detention Officers, and Senior Detention Officers classified as non-exempt during the two-year period before the date of mailing of the notice contemplated by this stipulation in all correctional and detention centers nationwide excluding those who worked exclusively at the Eloy Detention Center [in Arizona], Lake Erie Correctional Institution [in Ohio], the Trousdale Turner Correctional Center [in Tennessee], and any location in California.

Joint Stipulation for Conditional Certification and Notice to Collective Action Members at 1, filed November 16, 2020 (Doc. 27-3). Ballard is also brought on behalf of a group of Ohio workers, defined as: "All of Defendant's current and former correctional and detention officers who worked in Ohio and worked 40 or more hours in at least one workweek at any point within two years preceding this action." Jeanne Ballard, Marsha Caposell, Gregory Scott Glatian, and John Gandara on behalf of themselves and others similarly situated v. CoreCivic of Tennessee, LLC., Class and Collective Action Complaint ¶ 35, at 5, filed November 16, 2020 (Doc. 27-1)("Ballard Complaint").

## PROCEDURAL BACKGROUND

On June 25, 2020, Jim -- on behalf of himself and others similarly situated -- filed this suit

in the District of New Mexico, alleging that, by not compensating its correctional and detention officers for the time spent undergoing security screening, CoreCivic Tennessee violated the New Mexico Minimum Wage Act, N.M.S.A. § 50-4-22(D), breached its employment contracts with its employees, withheld the reasonable value of services (quantum meruit), and were unjustly enriched.  See Complaint ¶¶ 35-54, at 6-8.  Arguing that this case is substantially like Ballard, CoreCivic Tennessee asks the Court to transfer this case to the Middle District of Tennessee.  See Motion at 1-2; Supporting Brief at 2.  Jim prefers that this case stay in the District of New Mexico. See Response at 1.  The Court held a hearing on December 22, 2020.  See Clerk's Minutes at 1, filed December 22, 2020 (Doc. 38).

1.     **The Motion.**

CoreCivic Tennessee asks the Court to transfer this case to the Middle District of Tennessee.  See Motion at 1.  In the Motion, CoreCivic Tennessee states that Jim's counsel filed Ballard in the Middle District of Tennessee on May 15, 2020, "alleging that CoreCivic Tennessee failed to compensate Correctional and Detention Officers in numerous states (including New Mexico) for time spent in security screening," in violation of the FLSA and Ohio's overtime compensation statute, Ohio Rev. Code. Ann. § 4111.03.  Motion at 1.  CoreCivic Tennessee argues that, pursuant to the "first-to-file rule of federal comity," the Middle District of Tennessee "assumed jurisdiction over this dispute before the District of New Mexico."  Motion at 1. According to CoreCivic Tennessee, the "chronology of the actions, the similarity of the parties, and the similarity of the issues" support transferring this case to the Middle District of Tennessee. Motion at 1-2.

2.     **CoreCivic Tennessee's Supporting Brief.**

The Motion is short and devotes little space to explaining its position and arguments, so

CoreCivic Tennessee filed a Supporting Brief more fully explaining their arguments.  See Supporting Brief at 1-12.  In the Supporting Brief, CoreCivic Tennessee makes four arguments: (i) the first-to-file standard of federal comity supports transfer to the Middle District of Tennessee; (ii) the actions' chronology supports transfer to the Middle District of Tennessee; (iii) the parties in this case and in Ballard are substantially similar; and (iv) this case's issues are the same as Ballard's issues.  See Supporting Brief at 5-12.  CoreCivic Tennessee asserts that the Court should transfer this case to the Middle District of Tennessee, because the "three factors in the first-to-file analysis overwhelmingly support transfer."  Supporting Brief at 12.

First, CoreCivic Tennessee states that the first-to-file rule governs this transfer question. See Supporting Brief at 5.  According to CoreCivic Tennessee, the first-to-file rule "gives priority to the first federal district court to obtain jurisdiction over parties and issues to avoid inconsistent or conflicting rulings and conserve judicial resources."  Supporting Brief at 5 (citing Cessna Aircraft Co. v. Brown, 348 F.2d 689, 692 (10th Cir. 1965)).  CoreCivic Tennessee states that the second-filed action's court may transfer the case to the first-filed action's court when there is "even an arguable application of the first-to-file rule," so the first-filed action's court can "determine ultimately whether the rule or a potential exception applies."  Supporting Brief at 6.  Because CoreCivic Tennessee argues that the first-to-file rules applies, it contends that the Court should consider: (i) the actions' chronology; (ii) the parties' similarity; and (iii) the issues' similarity.  See Supporting Brief at 7.

Second, CoreCivic Tennessee argues that the actions' chronology favors transferring this case to the Middle District of Tennessee.  See Supporting Brief at 7.  CoreCivic Tennessee states that, because Jim's counsel filed Ballard on May 15, 2020, the "Middle District of Tennessee therefore obtained jurisdiction over the parties and subject matter first."  Supporting Brief at 7.

Further, CoreCivic Tennessee contends that, because "no discovery has yet occurred," transferring this case to the Middle District of Tennessee will "not unnecessarily disrupt either proceeding." Supporting Brief at 7.

Third, CoreCivic Tennessee asserts that the parties in this case are "sufficiently similar" to the parties in Ballard to justify transfer. Supporting Brief at 7. "CoreCivic is the Defendant in each case." Supporting Brief at 7. According to CoreCivic Tennessee, the United States Court of Appeals for the Tenth Circuit requires that courts look "to the putative class members to determine whether there is 'similarity' or 'substantial overlap'" between the parties when deciding whether to transfer. Supporting Brief at 7 (citing Meador v. QES Wireline, LLC, No. CIV 17-0586 NF\KHR, 2018 WL 6164430, at *2 (D.N.M. June 26, 2018)(Freudenthal, J.) and Letbetter v. Local 514, Transp. Working Union of Am., No. CIV 14-0125-TCK-FHM, 2014 WL 4403521, at *15 (N.D. Okla. Sept. 5, 2014)(Kern, J.)). CoreCivic Tennessee contends, therefore, that Ballard's stipulated collective definition "includes all Correctional Officers and Detention Officers employed by CoreCivic in New Mexico during the last two years," which "includes Plaintiff Jim, specifically, as well as members of the putative New Mexico Class he seeks to represent." Supporting Brief at 8. CoreCivic Tennessee asserts, therefore, that Ballard and this case "involve substantial overlap of putative plaintiffs." Supporting Brief at 8.

Fourth, CoreCivic Tennessee argues that the issues this case presents are "sufficiently similar" to Ballard's issues. Supporting Brief at 9. According to CoreCivic Tennessee, "[e]ach complaint turns on the common allegation that CoreCivic did not compensate employees for time spent undergoing mandatory security screening." Supporting Brief at 9. CoreCivic Tennessee submits, therefore, that not transferring this case could result in "two federal district courts . . . issu[ing] inconsistent or conflicting rulings as to both facts . . . and legal defenses." Supporting

Brief at 10.  Applying the first-to-file rule in of favor transferring would, according to CoreCivic Tennessee, "promote efficiency by not duplicating discovery and legal proceedings."  Supporting Brief at 10.  CoreCivic Tennessee states that the fact that this case "proceeds under New Mexico state law, while the Tennessee Case [Ballard] includes both federal and Ohio state law claims" does not affect this outcome.  Supporting Brief at 10.

     **3.**       **The Response.**

     Jim responds to the Motion, requesting that the Court not transfer the case to the Middle District of Tennessee.  See Plaintiff's Response to Defendant's Motion to Transfer Venue, filed December 8, 2020 (Doc. 31)("Response").  Jim states that this case "concerns a New Mexico resident who worked in New Mexico at a New Mexico prison and brought claims arising solely under New Mexico law while seeking to represent only New Mexico residents in a class action."  Response at 1.  Jim, therefore, makes two arguments: (i) the first-to-file rule does not support transfer; and (ii) the 28 U.S.C. § 1404(a) factors indicate that the District of New Mexico is the proper and most convenient forum for this case.  See Response at 3-16.

     First, Jim argues that the first-to-file rule does not favor transfer.  See Response at 3-8.  Jim contends that, although Jim's counsel filed Ballard first, this is the first lawsuit alleging that CoreCivic Tennessee violated New Mexico common law and New Mexico's minimum wage law, N.M.S.A. § 50-4-22(D).  See Response at 4.  According to Jim, the content of the lawsuit's allegations matters for the first-to-file's chronology factor.  See Response at 4.  Next, Jim contends that this case's issues are "distinct," Response at 6, from those in Ballard, because this case concerns New Mexico law issues -- including common law-- but Ballard hinges on an interpretation of the FLSA's portal-to-portal provision, which notes that certain "pre-shift and post-shift activities are not compensable," Response at 6.  Jim notes that New Mexico has no

portal-to-portal State analogue in its minimum-wage laws.  See Response at 6.  Jim also states that this case's parties are different than Ballard's parties, because there are at least 708 "potential New Mexico Class Members whose claims are only affected in this case and not in" Ballard.  Response at 8.

Second, Jim asserts that the Court also must consider the factors in 28 U.S.C. § 1404(a). See Response at 8 (citing Meador v. QES Wireline, LLC, 2018 WL 6164430, at *4).  According to Jim, these factors do not favor transfer.  See Response at 8.  Jim states that CoreCivic Tennessee does not take into account that the Court also must consider the 28 U.S.C. § 1404(a) factors, because "each of the factors supports a denial" of transfer to the Middle District of Tennessee. Response at 9.  Moreover, Jim contends that CoreCivic Tennessee's omission of the 28 U.S.C. § 1404(a) factors "dooms" its transfer request, because CoreCivic Tennessee "'bears the burden of establishing that the existing forum is inconvenient.'"  Response at 9 (quoting Scheidt v. Klein, 956 f.2d 963, 965 (10th Cir. 1992)).  Jim argues that each of the 28 U.S.C. § 1404(a) factors disfavors transfer: (i) Jim lives in New Mexico and his choice of forum deserves deference; (ii) all material witnesses are in New Mexico; (ii) litigating New Mexico State-law claims, about events that happened in New Mexico, in Tennessee would be more expensive; (iv) a judgment in Tennessee is not more easily enforceable than a judgment in New Mexico; (v) the Middle District of Tennessee's docket is more congested than the District of New Mexico's docket; (vi) conflict of laws favors litigating in New Mexico, because the issues arise exclusively under New Mexico law, so it is better for a federal court in New Mexico to hear the case than a federal court in Tennessee; (vii) the District of New Mexico has a greater interest in resolving Jim's claims against CoreCivic Tennessee than does the Middle District of Tennessee; and (viii) all the other factors are either neutral or irrelevant.  See Response at 9-15.  Jim argues, therefore, that the Court should

deny the Motion and keep the case in the District of New Mexico.

**4.** **The Reply.**

CoreCivic Tennessee replies, contending that the 28 U.S.C. § 1404(a) factors do not apply, and reasserting that the first-to-file rule favors transfer. See Defendant's Reply to Plaintiff's Response to Defendant's Motion to Transfer Venue at 1, filed December 17 (Doc. 36)("Reply"). First, CoreCivic Tennessee argues that Jim's contention that the Court also must consider the 28 U.S.C. § 1404(a) factors is mistaken. See Reply at 5. CoreCivic Tennessee alleges that Jim's discussion of Meador v. QES Wireline, LLC, 2018 WL 6164430, is incorrect, and that a court need not consider both the first-to-file rule and the 28 U.S.C. § 1404(a) factors before deciding to transfer a case. See Reply at 5. According to CoreCivic, Tennessee the defendant in Meador v. QES Wireline, LLC, 2018 WL 6164430, "moved for transfer under *both* the first-to-file rules and 28 U.S.C. § 1404(a)," so the court considered "the reasons why the motion to transfer should be granted under either theory." Reply at 5 (emphasis in original). CoreCivic Tennessee states that the first-to-file rule and the 28 U.S.C. § 1404(a) factors are alternative grounds for a court to transfer a case. CoreCivic Tennessee alleges that Jim's reliance on United States ex rel. Brown Minneapolis Tank Co. v. Kinley Const. Co., 816 F. Supp. 2d 1139 (D.N.M. 2011)(Browning, J.), is "misleading," because the language that Jim invokes is "not a holding, but simply a citation to a Seventh Circuit decision and part of a larger discussion of the principle," Reply at 5, that the decision to transfer a case is within a court's discretion, and is subject to analysis "of the applicable first-to-file factors," Reply at 6.

Second, CoreCivic Tennessee reasserts that the first-to-file rule favors transferring this case to the Middle District of Tennessee. See Reply at 6. According to CoreCivic Tennessee, this case does not fall within the "extraordinary circumstances" exception to the first-to-file rule, where a

court retains jurisdiction over duplicative litigation.  Reply at 6 (citing Hubbard v. Argent Mortg.
Co., LLC, No. CIV 15-2375-WJM-CBS, 2016 WL 4537869, at *5 (D. Colo. Aug. 31,
2016)(Shaffer, M.J.)).  CoreCivic Tennessee argues that all of the three first-to-file rule factors
favor transfer: (i) Jim's counsel filed Ballard first, and the two cases "relate to the same factual
basis," Reply at 7; (ii) the parties are substantially similar, because there are sixty-four overlapping
class members, see Reply at 7-8; and (iii) although the causes of action and applicable law differs,
the "cases raise one central issue for determination: whether CoreCivic Tennessee failed to meet
an obligation to its employees, pursuant to applicable wage and hour statutes or common law, by
not compensating employees for time spent undergoing mandatory security screening," Reply at
8.  CoreCivic Tennessee maintains that the fact that Jim raises different claims than the plaintiffs
in Ballard is inapposite, because "the factual issues to be determined are the same."  Reply at 9.
Moreover, CoreCivic Tennessee argues that the "existence of disparate remedies for the same
alleged harm weighs in favor of transfer," because "*the competing district court cases risk
awarding improper double recovery to the same class members based on the same alleged
conduct.*"  Reply at 10 (citing Rivera v. McCoy Corp., 240 F. Supp. 3d 1150, 1154-55 (D.N.M.
2017)(Garza, M.J.)(emphasis in Reply, and not in Rivera v. McCoy Corp.).

    **5.**    **The Hearing**.

    The Court held a hearing on December 22, 2020.  See Clerk's Minutes at 1, filed December
22, 2020 (Doc. 38).  The hearing began with the Court stating that it is inclined to conclude that,
if it were to transfer this case to the Middle District of Tennessee, that it would be "dumping work
on some judge in Tennessee and not doing my own work."  Transcript of Hearing at 3:4-5 (taken
December 22, 2020)(Court)("Tr.").[2]  The Court noted that "a corporation can be sued in a lot of

---

    [2]The Court's citations to the transcript of the hearing refer to the court reporter's original,

states," Tr. at 3:5-6 (Court), this case is not multidistrict litigation ("MDL")[3], and the two cases do not have the same claims, see Tr. at 3:10-11 (Court).  The Court noted that the relevant motion-to-transfer factors "just don't . . . lean very heavily, at all[,] toward transferring the case."  Tr. at 3:18-19 (Court).

CoreCivic Tennessee then spoke in support of its Motion, stating that Jim's counsel "brought three overlapping class and collected actions in three different case[s] all against CoreCivic," Tr. at 4:12-13 (Pritchard), in February, and March, 2020, but that "it was the same case, same claims in all three cases," Tr. at 4:19-20 (Pritchard).  CoreCivic Tennessee noted that Jim's counsel later decided it would be more efficient to consolidate the cases and litigate only in "the jurisdiction where [CoreCivic Tennessee] is headquartered."  Tr. at 5:5-6 (Pritchard).  According to CoreCivic Tennessee, Jim's counsel "stipulated to move those cases via dismissal and a refiling of a consolidated action," Tr. at 5:7-8 (Pritchard), in the Middle District of Tennessee, "and it makes sense to do that," because "the issue in fact is really the same," Tr. at 5:9-10 (Pritchard).

CoreCivic Tennessee contended that, in this case, Jim "and his attorneys working together seek to pursue this claim on behalf [of a] class of . . . 64 of whom are already pursuing their claims as part of that consolidated nationwide class" in Ballard.  Tr. at 6:2-5 (Pritchard).  CoreCivic Tennessee stated that, "[i]mportantly[,] here[,] it was [Jim's] own counsel who caused this overla[p]," because "they are the ones who brought the first filed action in the district where

_____

unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[3]Parties may pursue multidistrict litigation, or MDL, when "civil actions involving one or more common questions of fact are pending in different districts."  28 U.S.C. § 1407(a).  Section 1407(a) states that, with the judicial panel on multidistrict litigation's authorization, "such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."  28 U.S.C. § 1407(a).  See also 28 U.S.C. § 2112.

CoreCivic is headquartered" and "secured conditional certification of a nationwide FLSA collective action" in the Middle District of Tennessee. Tr. at 6:9-15 (Pritchard). CoreCivic Tennessee asserted that the Ballard class "includes the New Mexico officers who are the subject of the putative class in this case and seeks compensation on their behalf for this very same activity that are at issue in this case." Tr. at 6:15-19 (Pritchard). According to CoreCivic Tennessee, Jim is

> one of the officers . . . who received notice of the Tennessee action facilitated by [Jim's counsel] and we don't know of course through the attorney-client privilege what conversation happened between Mr. Jim and [his] counsel, but somehow[,] despite being invited [to] join that case[,] Mr. Jim chose to pursue his claims in New Mexico . . . .

Tr. at 7:8-14 (Pritchard). CoreCivic Tennessee continued by noting that "of course it's his right to do that but once . . . [Jim] seeks to pursue the claims on behalf of a class that has already been conditionally certified in Tennessee pursuant to a stipulation that was facilitated by Mr. Jim's own attorney," Tr. at 7:15-19 (Pritchard), then the "dynamics shift and the balance of consideration shifts and in favor of transferring the class action to Tennessee," Tr. at 7:19-21 (Pritchard).

In response to the Court's concern that transferring this case would shift work to the Middle District of Tennessee, CoreCivic Tennessee stated that "we're [not] really dumping anything or asking the Court to dump anything on Judge Richardson in Tennessee," Tr. at 8:8-10 (Pritchard), because "Judge Richardson already has a nationwide collective action in which the issues associated with a preliminary preshift security screenings is fully vetted," Tr. at 8:10-13 (Pritchard). Moreover, CoreCivic Tennessee alleged, "[i]f anything, [Jim's] counsel has dumped these issues on you, [by] expanding the number of federal judges who will be considering these issues." Tr. at 8:17-19 (Pritchard). According to CoreCivic Tennessee, the "only difference [between this case and Ballard is that under New Mexico law there may be a different legal

standard applied to the question of compensability." Tr. at 9:2-5 (Pritchard).  CoreCivic Tennessee

stated that the risk of not transferring this case is that

> at least 64 officers who are members of the collective in Tennessee, and the putative
> class members of the class in New Mexico . . . will be part of two classes seeking
> compensation for the exact same activity under potentially different sets of laws
> that may or may not be looked at in the same way.

Tr. at 9:19-10:1 (Pritchard).  CoreCivic Tennessee reiterated that "the most important factors are[,]

of course, chronology, similarity of parties[,] and similarity of issues." Tr. at 10:16-17 (Pritchard).

CoreCivic Tennessee turned to the 28 U.S.C. § 1404(a) factors.  See Tr. at 14:17

(Pritchard).  According to CoreCivic Tennessee, the case law "really suggests that the analysis

would stop at the three first[-]to[-]file factors, [and] that only under extraordinary circumstances

should the consideration of those factors not be dispositive."  Tr. at 14:19-22 (Pritchard).

CoreCivic Tennessee contended, however, that "there are no such extraordinary circumstances

here."  Tr. at 14:23-24 (Pritchard).  First, with respect to Jim's choice of forum, CoreCivic

Tennessee noted that Jim "doesn't want to pursue his individual claim . . . [;] he wants to pursue a

class claim."  Tr. at 15:3-4 (Pritchard).  With respect to witnesses, CoreCivic Tennessee argued

that "there really are not going to be significant necessary witnesses in New Mexico," Tr. at

15:115-17 (Pritchard), because "the testimony is going to come from operational witnesses who

are in Nashville," Tennessee, Tr. at 15:20-21 (Pritchard).  With respect to the cost of litigation,

CoreCivic Tennessee stated that Jim's counsel "essentially admitted . . . that it would make much

[more] sense to have the litigation in one place."  Tr. at 15:25-16:2 (Pritchard).  With respect to

court congestion issues, CoreCivic Tennessee alleged that "both courts are fairly similar on the

statistics," Tr. at 16:12-13 (Pritchard), and that the Middle District of Tennessee is "already dealing

with this issue," Tr. at 16:19-20 (Pritchard).  CoreCivic Tennessee stated that, with respect to the

compelling interest factor, it is "a wash," Tr. at 16:25 (Pritchard), because CoreCivic Tennessee

has its headquarters in Tennessee and a federal court in Tennessee "can certainly interpret and enforce New Mexico law just as competently as anyone else," Tr. at 17:11-13 (Pritchard).

Jim then responded.  See Tr. at 18:12 (Foty).  Jim contended that this case is "materially different" than Ballard, and that New Mexico law is different than the FLSA.  Tr. at 18:22 (Foty).  Jim also stated that the Court's observation, that CoreCivic Tennessee "operates across the country and chose to do business in New Mexico," is "important."  Tr. at 18:1-2 (Foty).  Jim stated that it believes CoreCivic Tennessee operates in "a majority of the states, . . . they certainly operate in more than 20 states."  Tr. at 19:6-8 (Foty).  Jim noted that, because CoreCivic Tennessee operates in New Mexico, "they chose to subject themselves to the jurisdiction of New Mexico."  Tr. at 19:1-12 (Foty).

The Court asked if CoreCivic Tennessee has sought an MDL, because they are being sued in multiple states.  See Tr. at 19:13-15 (Court).  Jim responded that CoreCivic Tennessee has not sought an MDL, but asserted that, "I don't think an MDL would even be certified or even be approved," Tr. at 19:18-19 (Foty), because CoreCivic Tennessee is "trying to do an end run around the MDL process by using the first to file rule and that's simply what they can't do," Tr. at 19:20-22 (Foty).  According to Jim, New Mexico has a sufficiently compelling interest to resolve this case, and the Middle District of Tennessee is "handling a different lawsuit involving a different law that happens to have correctional officers," which "does not mean that a different claim involving different workers should then be transferred to Tennessee."  Tr. at 20:3-7 (Foty).

The Court asked what Jim's reasoning was when he agreed to transfer three cases to Tennessee, but also bring this separate action in New Mexico.  See Tr. at 20:9-11 (Court).  Jim's counsel stated that "it actually wasn't me," Tr. at 20:13 (Foty), and that there are "three separate law firms . . . involved in this case," and that there is "another lawyer who brought those lawsuits,

and he invited me to assist in that representation of this case," Tr. at 20:14-17 (Foty).  Jim noted

that the rationale behind the consolidation is that each of the cases raises FLSA claims.  See Tr. at

20:18-21:5 (Foty).  According to Jim, New Mexico law is very different from the FLSA, so "it's

important for a New Mexico court to interpret New Mexico law to apply that legal standard," Tr.

at 21:17-19 (Foty), even though the Supreme Court of New Mexico "hasn't firmly addressed this

issue," Tr. at 21:21-22 (Foty).  Jim also asserted that the parties in this case are "very different"

than the parties in Ballard.  See Tr. at 22:9 (Foty).  Jim stated that there are "700 proposed class

members that are by definition excluded from" Ballard.  Tr. at 22:12-15 (Foty).

Jim argued that it is "telling" that CoreCivic Tennessee did not brief the 28 U.S.C.

§ 1404(a) factors in its briefing, because they do not support transfer.  Tr. at 22:22 (Foty).  The

Court interjected, noting that CoreCivic Tennessee argues that the 28 U.S.C. § 1404(a) factors

"don't even apply, [because] they say that I didn't hold that the [§ 1404] factors apply when

someone raises the first [to] file rule."  Tr. at 22:25-23:2 (Court).  Jim agreed and alleged that the

cases on which CoreCivic Tennessee relies are "materially different" to this case.  Tr. at 23:11

(Foty).  Jim argued that, to join the Ballard class, someone has to affirmatively join, and there are

"700 individuals who chose not to join the Tennessee action, and stated that" they want their claims

resolved in "a New Mexico action before a New Mexico court."  Tr. at 24:13-16 (Foty).

Next, Jim drew parallels between this case and Abraham v. WPX Energy Productions,

LLC, No. CIV 12-0917 JB/CG, 2016 WL 548251 (D.N.M. Jan. 25, 2016)(Browning, J.), where,

according to Jim, the Court "denied a similar motion under . . . the first to file rule."  Tr. at 24:19-

20 (Foty).  Jim stated that, in Abraham v. WPX Energy Productions, LLC, 2016 WL 548251, the

"class members between the two filed actions . . . were actually identical," Tr. at 24:22-23 (Foty),

whereas here there are "700 individuals who are only subject to the New Mexico case and . . . not

subject to the Tennessee case," Tr. at 24:24-25:1 (Foty).  Jim further stated that, in Abraham v. WPX Energy Productions, LLC, 2016 WL 548251, the "Claims that were brought in the second filed case were essentially identical to the claims that were brought in the first filed case," Tr. at 25:1-3 (Foty), but the Court "denied the motion under the first[-]to[-]file rule," Tr. at 25:5 (Foty). Here, Jim asserted, "the claims are different . . . [and] the class members are different." Tr. at 25:5-7 (Foty).

The Court asked Jim what he thinks about "the charge that this involves claim splitting, that you're not bringing all the claims in one case [--] the federal and state claims in one case?" Tr. at 25:19-22 (Court). Jim responded, stating that there are "approximately 800 potential class members in New Mexico, 60 of which . . . joined the FLSA case," Tr. at 25:24-26:2 (Foty), and that, here, "[w]e're going to define our class in this case to specifically exclude anybody who opted into the Ballard case," Tr. at 26:2-4 (Foty), which leaves "700 of the individuals solely in the New Mexico case, "Tr. at 26:5 (Foty).  According to Jim, that detail resolves the claim-splitting argument.  See Tr. at 26:6-8 (Foty).

The Court then asked about the risk of double recovery.  See Tr. at 26:9-12 (Court). The Court asked: "If they pick up all their money on the FLSA, isn't that going to wipe out the damage claim here"?  Tr. at 26:9-12 (Court).  "Potentially," Jim responded.  Tr. at 26:13 (Foty). Jim noted, however: "They could get the money under the FLSA and still get money under New Mexico law because the FLSA only covers hours worked over 40[,] [w]hereas New Mexico law covers both hours worked over 40 and hours worked less than 40."  Tr. at 26:15-19 (Foty).  According to Jim, "anybody who joined the Ballard case potentially could get credit for what was paid, but . . . it wouldn't wipe away their claim."  Tr. at 26:19-21 (Foty).

The Court then offered CoreCivic Tennessee the opportunity to respond to Jim's

arguments.  <u>See</u> Tr. at 27:4-5 (Court).  CoreCivic Tennessee stated that Jim's contention that he

will redefine the class to exclude "the 64 individuals who opted into the <u>Ballard</u> case," Tr. at 27:12

(Pritchard), puts these sixty-four people from Tennessee into an "untenable position," Tr. at 27:16-

19 (Pritchard), as Mr. Foty represents them in the Tennessee case.  CoreCivic Tennessee argued

that Jim states that he is going to "redefine the class in New Mexico to cut them out of the New

Mexico case[,] then he said if they win, maybe they'll stay in the New Mexico case, but they'll

have to deal with the credit against the recovery if any in the Tennessee case."  Tr. at 17:20-24

(Pritchard).  According to CoreCivic Tennessee, this position "is the result of the conflict that

[Jim's] class [counsel] has placed themselves in by having to essentially play [fast and loose] with

respect to class members [,] those [who] chose to join the Tennessee case are now being put into

this difficult circumstance."  Tr. at 27:25-28:5 (Pritchard).  CoreCivic Tennessee contended that

the New Mexico class's "own lawyer doesn't appear to even understand exactly where they should

be," Tr. at 28:5-6 (Pritchard), because Jim's counsel is saying that "they joined the case, there

should be credit, but he's going to define them to kick them out of New Mexico," Tr. at 28:7-9

(Pritchard).  CoreCivic Tennessee also noted that New Mexico "has a different legal standard, so

maybe they could lose in the FLSA case, but win in a New Mexico case."  Tr. at 28:9-11

(Pritchard).  According to CoreCivic Tennessee, "[a]ll these issues would go away" if this case is

transferred to the Middle District of Tennessee.  Tr. at 28:13 (Pritchard).

CoreCivic Tennessee asserted that Jim's contention that "700 or so people affirmatively

chose to litigate their claims in New Mexico," Tr. at 28:21-23 (Pritchard), is "not quite true," Tr.

at 28:23 (Pritchard).  According to CoreCivic Tennessee, "a notice went out . . . [and] 64 people

chose to join the case," Tr. at 28:25 (Pritchard), and the "other folks either didn't get the letter,

didn't open the letter, . . . chose not to join it, [or] maybe they didn't understand it," Tr. at 29:1-3

(Pritchard).   CoreCivic Tennessee argued that, except for Jim, these people have "made no affirmative representation that they've chosen to litigate their claims in New Mexico." Tr. at 29:5-6 (Pritchard).  CoreCivic Tennessee noted that they have no related objections with Jim litigating his claims in New Mexico "individually."  Tr. at 29:8 (Pritchard).

CoreCivic Tennessee then addressed the Court's earlier question about the possibility of an MDL.  See Tr. at 29:11 (Pritchard).  CoreCivic Tennessee stated that it had earlier considered the possibility of an MDL, but Jim's counsel "made the decision to voluntarily eliminate what we thought would be the potential justification for MDL by voluntarily dismissing the Oklahoma, Colorado, and Ohio cases and bringing them as one." Tr. at 29:22-24 (Pritchard).  According to CoreCivic Tennessee, the new suit was brought "to include a state law class claim appended to the FLSA collective claim," Tr.at 29:24-25 (Pritchard), and the "same could be done here," Tr. at 30:1 (Pritchard).

Next, CoreCivic Tennessee addressed Jim's arguments regarding the 28 U.S.C. § 1404(a) factors.  See Tr. at 30:6 (Pritchard).  CoreCivic Tennessee stated that there is "certainly nothing wrong with looking at 1404 as providing some guidance and some considerations," Tr. at 30:10-11 (Pritchard), but that the first-to-file rule is "different," and "addresses the issue here, [namely] the conflict and the overlap and the claim splitting that arises when attorneys try to bring cases alleging the same fact issues and similar legal issues in different jurisdiction where they will be competing against one another," Tr. at 30:16-21 (Pritchard).  CoreCivic Tennessee contended that transferring this case to the Middle District of Tennessee would avoid that "conflict and competition."  Tr. at 30:22 (Pritchard).

The Court then stated that it was going to "hang on to the case for a while."  Tr. at 31:1-2 (Court).  Although, the Court noted, the situation will change if this case turns into an MDL, "I

still feel that this is work I ought to be doing rather than transferring to Tennessee." Tr. at 31:6-7 (Court). The Court stated:

> It just seems to me a case that ought to remain here given the transfer rules that we use under the United States Code rather than the first[-to-]file rule given the differences between the cases. So I'm going to hang onto it for a while. And if something develops that [makes it so that] I need to do something else, then we can relook at it.

Tr. at 31:11-17 (Court). The Court stated that it is "going to deny the motion . . . at the present time." Tr. at 31:18-19 (Court).

After a brief scheduling discussion, CoreCivic Tennessee asked how and when Jim plans to redefine the class's scope as discussed. See Tr. at 33:20-34:3 (Pritchard). Jim noted that no class has been certified yet in New Mexico, but that his intention is to exclude the sixty-four people in the Ballard case from this case. See Tr. at 35:8-16 (Foty). Jim stated that he needs to discuss with his co-counsel to be sure, but that, "if someone is pursuing notice in the Ballard case and affirmatively opt[s] into the Ballard case, . . . unless they opt out of the Ballard case, then their claims should be pursued in the Ballard case, not in" this case. Tr. at 35:18-22 (Foty). CoreCivic Tennessee responded that this "attempt to walk back a commitment made during oral argument just moments ago is telling." Tr. at 36:7-9 (Pritchard). Jim contended that he is "not walking back anything," Tr. at 36:22 (Foty), but that "it's a little more complicated than" CoreCivic Tennessee acknowledges, "because it involves me communicating with those individuals," Tr. at 36:24-25 (Foty). Jim stated that he needs to discuss with the class members to determine who is in which case's class. See Tr. at 37:1-20 (Foty).

The Court sought clarification, asking if it can "take to the bank and put in my opinion that there will not be people litigating in both cases." Tr. at 27:21-23 (Court). In response, Jim stated: "That is correct, Your Honor, you can do that." Tr. at 38:5-6 (Foty). The Court noted "that

probably solves the problem [and,] in fact[,] it makes it even cleaner."  Tr. at 38:8-9 (Court).

CoreCivic Tennessee contended that parties in <u>Ballard</u> "can't just walk in and out of cases and say,

[']Oh, I changed my mind.[']"  Tr. at 38:21-22 (Pritchard).  Jim noted that if a party chooses "to

join a collective action at any time they can withdraw that consent.  That's specifically in the

notice."  Tr. at 39:8-10 (Foty).  The hearing concluded with the Court noting that "this is [an] issue

that's just going to take care of itself, [because] people are going to decide where they want to

litigate and what claims they want to bring."  Tr. at 39:20-23 (Court).

## LAW REGARDING FIRST-TO-FILE RULE

"[T]he 'first to file' rule . . . pertains when two district courts have jurisdiction over the

same controversy, affording deference to the first filed lawsuit."  <u>U.S. ex rel. Brown Minneapolis</u>

<u>Tank Co. v. Kinley Const. Co.</u>, 816 F. Supp. 2d 1139, 1149-50 (D.N.M. 2011)(Browning,

J.)(quoting <u>Lipari v. U.S. Bancorp NA</u>, 345 F. App'x 315, 317 (10th Cir. 2009)(unpublished)[4]).

The Tenth Circuit has held that, "[u]nder this rule, courts consider three factors: '(1) the

chronology of events, (2) the similarity of the parties involved, and (3) the similarity of the issues

---

[4]<u>Lipari v. U.S. Bancorp NA</u> is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>Lipari v. U.S. Bancorp NA</u>, 345 F. App'x 315, 317 (10th Cir. 2009), <u>Driggers v. Clark</u>, 422 F. App'x 747, and <u>Rodriguez v. City of Albuquerque</u>, 420 F. App'x 845 (10th Cir. 2011), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

or claims at stake.'" <u>Wakaya Perfection, LLC v. Youngevity Int'l, Inc.</u>, 910 F.3d 1118, 1124 (10th Cir. 2018)("<u>Wakaya Perfection</u>")(quoting <u>Baatz v. Columbia Gas Transmission, LLC</u>, 814 F.3d 785, 789 (6th Cir. 2016)("<u>Baatz</u>")).  In addition to these considerations, equitable factors such as "inequitable conduct, bad faith, anticipatory suits, and forum shopping," may also weigh on the decision.  <u>Wakaya Perfection</u>, 910 F.3d at 1124 (citing <u>Baatz</u>, 814 F.3d at 789).

The Tenth Circuit has "adopted the first-to-file rule as a baseline." <u>Wakaya Perfection</u>, 910 F.3d at 1124 (citing <u>Hospah Coal Co. v. Chaco Energy Co.</u>, 673 F.2d 1161, 1164 (10th Cir. 1982)).  Courts, however, do not apply mechanically the first-to-file rule.  <u>See</u> <u>United States ex rel. Brown Minneapolis Tank Co. v. Kinley Const. Co.</u>, 816 F. Supp. 2d at 1150 (citing <u>Hospah Coal Co. v. Chaco Energy Co.</u>, 673 F.2d at 1164).  "[T]he first-to-file rule 'permits,' but does not require, a federal district court to abstain from exercising its jurisdiction in deference to a first-filed case in a different federal district court."  <u>Wakaya Perfection</u>, 910 F.3d at 1124 (quoting <u>Hospah Coal Co. v. Chaco Energy Co.</u>, 673 F.2d 1161, 1164 (10th Cir. 1982)).

The Tenth Circuit recognizes "that 'the first court in which jurisdiction attaches has priority to consider the case' and jurisdiction 'relates back to the filing of the complaint.'  As a result, determining the chronology of events typically requires only a comparison of the two filing dates."  <u>Wakaya Perfection</u>, 910 F.3d at 1124 (quoting <u>Hospah Coal Co. v. Chaco Energy Co.</u>, 673 F.2d at 1163).  The Court should also consider "whether the two cases bear substantial overlap in (1) the parties and (2) the issues or claims."  <u>Wakaya Perfection</u>, 910 F.3d at 1126 (citing <u>Baatz</u>, 814 F.3d at 790-91).  District courts in the Tenth Circuit have held that "[i]t is well accepted that 'the parties do not need to be identical' and that '[o]nly similarity or substantial overlap is required.' . . . .  'Similarly, the issues must only be substantially similar in that they seek like forms of relief and hinge on the outcome of the same legal/factual issues.'" <u>Cherokee Nation v.</u>

<u>Nash</u>, 724 F. Supp. 2d 1159, 1168 (N.D. Ok. 2010)(Kern, J.)(quoting <u>Shannon's Rainbow, LLC</u> <u>v. Supernova Media, Inc.</u>, 683 F. Supp. 2d 1261, 1278-79 (D. Utah 2010)(Stewart, J.); <u>Wallace B.</u> <u>Roderick Revocable Living Trust v. XTO Energy, Inc.</u>, 679 F. Supp. 2d 1287, 1289 (D. Kan. 2010)(Marten, J.)).

"After determining the sequence and similarities in the cases, 'court[s] must also determine whether any equitable considerations . . . merit not applying the first-to-file rule in a particular case.'" <u>Wakaya Perfection</u>, 910 F.3d at 1127 (quoting <u>Baatz</u>, 814 F.3d at 789).  The Tenth Circuit has noted that the rule may be "disregarded 'to prevent a misuse of litigation in the nature of vexatious and oppressive foreign suits.'" <u>Wakaya Perfection</u>, 910 F.3d at 1127 (quoting <u>O'Hare</u> <u>Int'l Bank v. Lambert</u>, 459 F.2d 328, 331 (10th Cir. 1972)).  Nor should the Court employ the rule "when doing so would reward forum shopping." <u>Wakaya Perfection</u>, 910 F.3d at 1127 (citing <u>Span-Eng Assocs. v. Weidner</u>, 771 F.2d 464, 470 (10th Cir. 1985)).  Such considerations are not exhaustive, and their consideration promotes the idea that "the district court cannot resort to a 'rigid mechanical solution'" in applying the first-to-file rule.  <u>Wakaya Perfection</u>, 910 F.3d at 1124 (quoting <u>Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.</u>, 342 U.S. 180, 183 (1952)).

## **LAW REGARDING TRANSFER OF VENUE**

In 1948, Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district.  That statute provides, in pertinent part: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Section 1404(a) affords a district court broad discretion to adjudicate motions to transfer based on a case-by-case review of convenience and fairness.  See <u>Chrysler Credit Corp.</u>,

928 F.2d at 1516.  "Recognizing that what is convenient for one litigant may not be convenient for the other, the Supreme Court has taught that section 1404(a) 'is intended to place discretion in the district court to adjudicate motions for transfer according to [a] . . . case-by-case consideration of convenience and fairness.'"  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 977 (7th Cir. 2010)("Research Automation")(quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)).  "The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice."  Research Automation, 626 F.3d at 977.  The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

> Among the factors [to] consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Chrysler Credit Corp., 928 F.2d at 1516 (quoting Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145, 147 (10th Cir. 1967)).

Section 1406 "permits transfer to cure a venue defect."  Whiting v. Hogan, 855 F. Supp. 2d 1266, 1284 (D.N.M. 2012)(Browning, J.).  It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such a case to any district or division in which it could have been brought."  28 U.S.C. § 1406.  Although both § 1404(a) and § 1406(a) "were broadly designed to allow

transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid." Van Dusen v. Barrack, 376 U.S. 612, 634 (1964).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration. Van Dusen v. Barrack, 376 U.S. at 626-27. "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." Research Automation, 626 F.3d at 977 (citing Chicago, Rock Island & Pacific Railroad Co. v. Igoe, 220 U.S. 299, 303 (7th Cir. 1955), Van Dusen v. Barrack, 376 U.S. at 645, Allied Van Lines, Inc. v. Aaron Transfer & Storage, Inc., 200 F. Supp. 2d 941, 946 (N.D. Ill. 2002)(Castillo, J.), and Hanley v. Omarc, Inc., 6 F. Supp. 2d 770, 777 (N.D. Ill. 1998)(Alesia, J.)).   In some circumstances, "[t]he interests of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Research Automation, 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-221 (7th Cir. 1986)).  The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action.   Driggers v. Clark, 422 F. App'x 747, 749-50 (10th Cir. 2011)(unpublished)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

## LAW REGARDING THE FLSA

The FLSA requires covered employers to pay a minimum wage, and to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week. See 29 U.S.C. §§ 206-207. The FLSA provides five means of enforcement: (i) criminal prosecutions for willful violators, see 29 U.S.C. § 216(a); (ii) individual

civil causes of action to recover unpaid minimum wages, overtime compensation and certain liquidated damages, see 29 U.S.C. § 216(b); (iii) collective actions to recover damages, which are basically opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary of the Department of Labor to recover employees' damages and for additional recovery of "an equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see 29 U.S.C. § 217.  "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

### 1.    Employers Under the FLSA.

The FLSA defines "employer" broadly:

> "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203.  "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship."  Saavedra v. Lowe's Home Ctrs., Inc., 748 F. Supp. 2d 1273, 1285 (D.N.M. 2010)(Browning, J.)(quoting Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33 (1961)).  The Supreme Court has instructed courts to construe the terms "employer" and "employee" expansively under the FLSA.  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992).  See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)("[T]here is in the [FLSA] no definition that solves problems as to the limits of the employer-employee relationship under the Act . . . .  The definition of 'employ' is broad.").  The Tenth Circuit has similarly recognized that "[t]he terms 'employ' and 'employer' are given . . .

broad . . . definitions." <u>Johnson v. Unified Gov't of Wyandotte Cnty.</u>, 371 F.3d 723, 729 (10th Cir. 2004)(Holloway, J.).

> The statute is a remedial one, written in the broadest possible terms . . . . It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act.

<u>Carter v. Dutchess Cmty. Coll.</u>, 735 F.2d 8, 12 (2d Cir. 1984). "Employer" includes persons or entities who have "managerial responsibilities" that give the person or entity "substantial control of the terms and conditions of the work of [its] employees." <u>Falk v. Brennan</u>, 414 U.S. 190, 195 (1973). "Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee compensation, may be held personally liable under the FLSA." <u>Saavedra v. Lowe's Home Ctrs, Inc.</u>, 748 F. Supp. 2d at 1288 (citing <u>Donovan v. Agnew</u>, 712 F.2d 1509, 1511 (1st Cir. 1983)). <u>See</u> <u>Fegley v. Higgins</u>, 19 F.3d 1126, 1131 (6th Cir. 1994); <u>Reich v. Circle C Invs. Inc.</u>, 998 F.2d 324, 329 (5th Cir. 1993); <u>Donovan v. Grim Hotel Co.</u>, 747 F.2d 966, 972 (5th Cir. 1984); <u>Donovan v. Janitorial Servs., Inc.</u>, 672 F.2d 530, 531 (5th Cir. 1982); <u>Shultz v. Mack Farland & Sons Roofing Co.</u>, 413 F.2d 1296, 1300 (5th Cir. 1969).

### 2.    <u>The FLSA's Minimum Wage, Overtime, and Records Requirements</u>.

FLSA § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'" <u>Chavez v. City of Albuquerque</u>, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.). The Tenth Circuit has recognized "that a contract cannot designate an

artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties

cannot avoid the purposes of the FLSA by designating a fictitious regular rate."  Chavez v. City of

Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th

Cir. 1947)).

> Much like the protections that the United States Constitution provides to United
> States citizens, the Court sees the FLSA as a minimum standard.  Employers are
> not allowed to provide their employees less protection . . . than the Act provides. If
> the employer wishes, however, it may provide its employees more protections than
> the Act dictates.

Rodriguez v. City of Albuquerque, 687 F. Supp. 2d 1270, 1309 (D.N.M. 2009)(Browning, J.),

aff'd in part, rev'd in part and remanded, 420 F. App'x 845 (10th Cir. 2011).

Under the FLSA, an employer must pay its employees for the time that it "employ[s]"

them, the statutory definition of which means "to suffer or permit to work."  29 U.S.C. § 203(g).

See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer

or permit to work.'  The act, however, contains no definition of 'work.'").  "The test for whether

an employee's time constitutes working time is whether the time is spent predominantly for the

employer's benefit or for the employee's."   United Transp. Union Local 1745 v. City of

Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(internal quotation marks omitted)(quoting

Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993)).  The Supreme Court has rejected

the argument that Congress' intent in enacting the FLSA was to compensate employees "for all

actual work . . . as those words are commonly used -- as meaning physical or mental exertion

(whether burdensome or not) controlled or required by the employer and pursued necessarily and

primarily for the benefit of the employer and his business."  Armour & Co. v. Wantock, 323 U.S.

126, 132 (1944)(quoting Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123, 321 U.S. 590, 597

(1944)).  The Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but
> wait for something to happen.  Refraining from other activity often is a factor of
> instant readiness to serve, and idleness plays a part in all employments in a stand-
> by capacity.  Readiness to serve may be hired, quite as much as service itself, and
> time spent lying in wait for threats to the safety of the employer's property may be
> treated by the parties as a benefit to the employer.  Whether time is spent
> predominantly for the employer's benefit or for the employee's is a question
> dependent upon all the circumstances of the case.

Armour & Co. v. Wantock, 323 U.S. at 133.

FLSA § 6 requires employers to pay their employees a minimum wage.  See 29 U.S.C.

§ 206(a).  Deductions from employees' paychecks, for whatever reason, that bring the employees'

pay under the minimum wage violate § 6.  See Donovan v. Simmons Petrol. Corp., 725 F.2d 83,

84 (10th Cir. 1983)(holding that the employer's deductions of "cash register shortages and the

amount of uncollectible checks accepted by its employees from the paychecks of employees who

were on duty when the shortages occurred" was a willful FLSA violation).  Cf. Dole v. Solid Waste

Servs., Inc., 733 F. Supp. 895, 924 (E.D. Pa. 1989)(Huyett, J.)(concluding that deductions "for

lunch breaks during which [employees were] required to continue with any duties relating

to . . . work," bringing employees below minimum wage, violated the FLSA).  Further, FLSA § 11

imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages,

hours, and "other conditions and practices of employment" that the employer may maintain.

29 U.S.C. § 211(c).  In Donovan v. Simmons Petroleum Corporation, the Tenth Circuit recognized

the employers' duty under the FLSA to keep accurate records in discussing the shift of the burden

to prove damages between the employee and the employer:

> The employee bears the burden of proving he performed work for which he
> was not properly compensated.  Anderson v. Mt. Clemens Pottery Co., 328 U.S.
> 680, 687 (1946).  However, employers have a duty to keep accurate records.  If
> employers do not keep accurate records the employee's burden is extremely
> difficult.  In order to prevent the employee from being penalized by the employer's
> failure to keep adequate records, the Supreme Court held in Anderson that an
> employee carries his burden by proving that he has "in fact performed work for

which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate. The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law. Id. at 687-88.

Donovan v. Simmons Petrol. Corp., 725 F.2d at 85-86. The federal Department of Labor's Wage and Hour Division requires that employers must maintain in their records the time of day and day of the week on which the employee's workweek begins, the regularly hourly pay rate for the employee in any week in which overtime compensation is due, the hours worked each workday and workweek, the total daily or weekly straight-time earned, and the total overtime. See 29 C.F.R. § 516.2(a). Where an employer violates its § 211(c) record-keeping duties, including by not counting time worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the Labor and Wage investigators' reasonable estimates of backpay due to the employees. See Metzler v. IBP, Inc., 127 F.3d 959, 965-66 (10th Cir. 1997)("When the employer has failed to record compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ]."); U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district court's conclusion that the calculations of the investigator are a reasonable and generous estimate of the back wages due to the Defendants' employees for the pre-shift and postshift hours worked.").

Section 7(a) sets forth the general rule for calculating overtime. See 29 U.S.C. § 207(a)(1). Because the FLSA does not put a limit "on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer

must pay] the required overtime compensation . . . for hours worked in excess of the maximum

workweek prescribed by section 7(a)."  29 C.F.R. § 778.102.  The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his
> employees . . . for a workweek longer than forty hours unless such employee
> receives compensation for his employment in excess of the hours above specified
> at a rate not less than one and one-half times the regular rate at which he is
> employed.

29 U.S.C. § 207(a)(1).  See 29 C.F.R. § 778.107 ("The general overtime pay standard in section

7(a) requires that overtime must be compensated at a rate not less than one and one-half times the

regular rate at which the employee is actually employed.").  The statute's language demands that

an employee receive one and one-half times the "regular rate" of pay for hours that he or she works

in excess of forty in a given week.  29 U.S.C. § 207(a)(1).

One important principle is that FLSA overtime is based on the number of hours worked in

a particular workweek.

> The Act does not . . . require . . . that an employee be paid overtime compensation
> for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays
> or regular days of rest.  If not more than the maximum hours prescribed in the Act
> are actually worked in the workweek, overtime pursuant to section 7(a) need not be
> paid.

29 C.F.R. § 778.102.  On the other hand, that the FLSA does not require that the employer pay

overtime for those hours does not relieve an employer from paying overtime for them if the

contract of employment demands them.  See 29 C.F.R. § 778.102.

For purposes of calculating overtime under the FLSA, however, the only concern is

whether the total hours worked in a given workweek are above or below the statutory requirement

for overtime compensation.  See 29 C.F.R. § 778.102.  A second important principle about

calculating overtime under the FLSA is that the employee must receive overtime pay at a rate of

no less than one and one-half times the "regular rate" for which the employer employs the

employee.  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The keystone of Section 7(a) is the regular rate of compensation.").  The Supreme Court described "the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed."  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. at 424.  Since the Supreme Court's opinion in Walling v. Youngerman-Reynolds Hardwood Co., Congress has amended the FLSA to include a description of regular rate, see 29 U.S.C. § 207(e)(stating that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight statutory exceptions),[5] and the interpretive bulletins have incorporated the Supreme Court's definition, see 29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'").  Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part.  See 29 C.F.R. § 779.108.

3.    **Compensable Time Under the FLSA.**

Congress enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, to define certain activities for which employers need not compensate pursuant to the FLSA.[6]  The Portal-to-Portal

---

[5]The FLSA now contains a description of what is included in the regular rate, but still contains no definition precisely setting forth how it is calculated.  See Scott v. City of N.Y., 592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)(Scheindlin, J.)("The words 'regular rate' are not defined in the Act." (quoting Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 40 (1944))(internal quotation marks omitted)).

[6]The Portal-to-Portal Act provides:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . --

Act excludes from compensation certain preliminary and postliminary activities, like pre-shift walking and, in some cases, changing clothes and putting on specific gear.  See Steiner v. Mitchell, 350 U.S. 247, 252 (1956); Reich v. IBP, Inc., 38 F.3d at 1126 (holding that the donning and doffing of safety glasses, ear plugs, a hard hat, and safety shoes are non-compensable preliminary and postliminary activities).  Under Department of Labor regulations explaining the Portal-to-Portal Act, see 29 C.F.R. § 790.6, the workday begins with the "first principal activity" and ends with the last, IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005)(quoting Steiner v. Mitchell, 350 U.S. at 256).

The Supreme Court clarified what constitutes a "principal activity" in IBP, Inc. v. Alvarez, 546 U.S. at 34.  It held that anything that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under the Portal-to-Portal Act, which makes it compensable.  546 U.S. at 37.  The Supreme Court noted that, to the extent that standard protective clothing and gear are "integral and indispensable" to a principal activity, the donning and doffing of those items are principal activities and are therefore compensable.  IBP, Inc. v. Alvarez, 546 U.S. at 36-37.  Accordingly, the key issue to determining compensability is whether the pre-shift activities are integral and indispensable to the employee's principal activities.  See Lindow v. United States, 738 F.2d 1057, 1060 (9th Cir. 1984)(Choy, J.)(concluding that pre-shift activities may be compensable if they are an "integral and indispensable" part of the principal activities).

---

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(emphasis added).

The Tenth Circuit has interpreted what constitutes preliminary, non-compensable activities.  In Smith v. Aztec Well Servicing Co., 462 F.3d 1274 (10th Cir. 2006), the plaintiffs argued that they were entitled to compensation for time spent loading their trucks with safety and protective gear, then traveling to the job site.  See 462 F.3d at 1276-77.  The Tenth Circuit acknowledged that, if the plaintiffs' first principal activity -- loading their trucks with protective gear -- occurred before traveling to the job site, then the plaintiffs' travel time constituted compensable work.  462 F.3d at 1289.  Nonetheless, the Tenth Circuit explained that, where

> an employee's activity "takes all of a few seconds and requires little or no concentration," then the activity is "properly considered not work at all." Moreover, "[r]equiring employees to show up at their work stations with such standard equipment [as a hard hat, safety glasses, earplugs, and safety shoes] is no different from having a baseball player show up in uniform, . . . or a judge with a robe."  It is simply a prerequisite for the job, and is purely preliminary in nature. Consequently, the plaintiffs' travel to and from the well sites was not integral and indispensable to their principal activities merely because they were required to carry their personal safety equipment along with them.

462 F.3d at 1289 (quoting Reich v. IBP, Inc., 38 F.3d at 1125, 1126 n.1).  In arriving at its decision that loading protective gear into the truck was not integral and indispensable to the plaintiffs' job, the Tenth Circuit considered the amount of time it took and the level of concentration.  See Smith v. Aztec Well Servicing Co., 462 F.3d at 1290-91.  The safety equipment was clearly required to do the job, yet the Tenth Circuit still found that it was not integral and indispensable to the employees' principal activities.  Similarly, in Reich v. IBP, Inc., the Tenth Circuit held that putting on safety glasses, ear plugs, a hard hat, and safety shoes was not compensable, because it "requires little or no concentration," and can easily be done while focusing on other things.  38 F.3d at 1126. "Thus, although essential to the job, and required by the employer, any time spent on these items is not work."  38 F.3d at 1126.  In contrast, putting on special protective gear that was "heavy and cumbersome," and required "physical exertion, time, and a modicum of concentration to put them

on securely and properly," was compensable, as this donning differed in kind rather than merely degree.  38 F.3d at 1126.

Because mandatory pre-shift briefings may be integral and indispensable to an employee's principal activities, they may form the basis of an FLSA overtime violation.  That "certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable,'" however.  IBP, Inc. v. Alvarez, 546 U.S. at 40.  An activity is integral and indispensable if it is an "intrinsic element" of the employee's principal activities, and one with which the employee cannot dispense if he or she is to perform his or her principal activities.  See Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. 27, 33 (2014).  Consequently, the Supreme Court has held that time spent waiting to don protective gear is not compensable, while time spent sharpening knives at a meatpacking plant is compensable, as dull knives would slow the assembly line production, cause waste, lead to accidents, and "affect the appearance of the meat as well as the quality."  Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 34 (quoting Mitchell v. King Packing Co., 350 U.S. 260, 262 (1956)).  In other words, the employees could not perform their jobs adequately without sharpening their knives.  See Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 29.

Recently, the Supreme Court held that time spent undergoing mandatory security screenings were not compensable.  See Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 35. The Supreme Court stated that, although the employer required employees to undergo the screenings, the screenings were not integral and indispensable to the principal task which they were paid to perform -- stocking warehouse shelves and packaging products.  See Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 35.  Importantly, the Supreme Court stated that the United States Court of Appeals for the Ninth Circuit "erred by focusing on whether an employer *required*

a particular activity.  The integral and indispensable test is tied to the productive work that the employee is *employed to perform*."  574 U.S. at 36 (emphasis in original).  Moreover, the Supreme Court held that it was not determinative whether the task benefitted the employer.  See 574 U.S. at 36

> [I]t is not enough to make an activity compensable under the Fair Labor Standards Act that the employer requires it and it is done for the benefit of the employer.  Even activities required by the employer and for the employer's benefit are "preliminary" or "postliminary" if not integral and indispensable to "the productive work that the employee is *employed to perform*."

Balestrieri v. Menlo Park Fire Prot. Dist., 800 F.3d 1094, 1101 (9th Cir. 2015)(Kleinfeld, J.)(emphasis in original)(quoting Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 28).

Finally, the Supreme Court reaffirmed its statement that, if the employee need not perform a task before every shift or the task can be eliminated altogether, it is not integral and indispensable.  See Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 37 (finding that an activity was not integral and indispensable when the employees did not participate in them every day); id. at 35 (finding that activities were not integral and indispensable if the employer could have eliminated the required practice without impairing the employees' ability to complete their work).  Unlike activities that are "*always* essential if the worker is to do his job," certain activities "may or may not be necessary in particular situations or for every employee."  IBP, Inc. v. Alvarez, 546 U.S. at 40.  When certain tasks are not necessary, the activity "comfortably qualif[ies] as a 'preliminary' activity."  IBP, Inc. v. Alvarez, 546 U.S. at 40.

### 4.     The FLSA's Remedies.

Actions to enforce the FLSA's overtime provisions are generally subject to a two-year statute of limitations unless the violation is willful, in which case the limitations period is three

years.  See 29 U.S.C. § 255(a).  A lawsuit to enforce a cause of action for unpaid minimum wages,

unpaid overtime compensation, or liquidated damages

> may be commenced within two years after the cause of action accrued, and every
> such action shall be forever barred unless commenced within two years after the
> cause of action accrued, except that a cause of action arising out of a willful
> violation may be commenced within three years after the cause of action
> accrued . . . .

29 U.S.C. § 255(a).  Willful violations occur when "the employer either knew or showed reckless

disregard for the matter of whether its conduct was prohibited by the [FLSA]."  McLaughlin v.

Richland Shoe Co., 486 U.S. 128, 133 (1988)(citing Trans World Airlines, Inc. v. Thurston, 469

U.S. 111 (1985)).

Beyond the actual damages to cover the amount of unpaid minimum wages or overtime

compensation, FLSA § 16(c) allows additional recovery of "an equal amount of liquidated

damages."  29 U.S.C. § 216(c).  The Tenth Circuit has noted: "The purpose for the award of

liquidated damages is 'the reality that the retention of a workman's pay may well result in damages

too obscure and difficult of proof for estimate other than by liquidated damages.'"  Renfro v.

Emporia, 948 F.2d 1529, 1540 (10th Cir. 1991)(quoting Laffey v. Nw. Airlines, Inc., 567 F.2d

429, 463 (D.C. Cir. 1976)).  If the employer can show that the conduct giving rise to the action to

recover back pay was in good faith, and that the employer had reasonable grounds to believe the

conduct was lawful, the court may refuse to award some or all liquidated damages:

> Under 29 U.S.C. § 260, if in any action to recover unpaid overtime compensation
> an employer "shows to the satisfaction of the court that the act or omission giving
> rise to such action was in good faith and that he had reasonable grounds for
> believing that his act or omission was not a violation of the FLSA," the court may
> refuse to award liquidated damages.
>
> > All circuits that have considered the matter hold that the trial court
> > may eliminate or reduce the award of liquidated damages only if the
> > employer shows both that he acted in good faith and that he had

> reasonable grounds for believing that his actions did not violate the
> Act.

Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d 720, 725 (10th Cir. 1984)).

The employer bears the burden to prove that the conduct was reasonable and in good faith.  See

Renfro v. Emporia, 948 F.2d at 1540.  For purposes of assessing whether the employer meets its

burden, "[t]he good faith requirement mandates the employer have 'an honest intention to ascertain

and follow the dictates of the [FLSA].  The additional requirement that the employer have

reasonable grounds for believing that his conduct complies with the Act imposes an objective

standard by which to judge the employer's behavior.'"  Renfro v. Emporia, 948 F.2d at 1540

(quoting Doty v. Elias, 733 F.2d at 725).  See Garcia v. Tyson Foods, Inc., 890 F. Supp. 2d 1273,

1295 (D. Kan. 2012)(Marten, J.)("While the employer must prove subjective good faith, it must

also prove that its actions were objectively reasonable.  If the employer meets that burden the court

retains discretion whether to award liquidated damages."(citations omitted)).

FLSA § 17 provides that district courts "shall have jurisdiction, for cause shown, to restrain

[FLSA] violations . . . including . . . the restraint of any withholding of payment of minimum

wages or overtime compensation found by the court to be due to employees under this

chapter . . . ."  29 U.S.C. § 217(c).  The question whether a court should grant an injunction is left

to the court's sound discretion.  See Mitchell v. Hertzke, 234 F.2d 183, 187 (10th Cir.

1956)("Although it is not clearly stated in these Labor Standards Act cases that the burden of

proving the need for an injunction is upon the movant[,] that is a general principle of law and

applies with legal force here.").  "The necessary determination is that there exists some cognizable

danger of recurrent violation, something more than the mere possibility which serves to keep the

case alive. Current compliance alone, particularly when achieved by direct scrutiny of the

government, is not sufficient ground for denying injunctive relief."  Metzler v. IBP, Inc., 127 F.3d

at 963 (alterations and citations omitted)(quoting <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953), and citing <u>Brock v. Big Bear Mkt. No. 3</u>, 825 F.2d 1381, 1383 (9th Cir. 1987)).   In exercising its discretion to grant a prospective injunction after finding a previous FLSA violation, "courts balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith."  <u>Metzler v. IBP, Inc.</u>, 127 F.3d at 963-64 (citing <u>Martin v. Coventry Fire Dist.</u>, 981 F.2d 1358, 1362 (1st Cir. 1992)).

## LAW REGARDING THE NMMWA

The New Mexico Minimum Wage Act ("NMMWA") requires that employers pay an employee "one-half times the employee's regular hourly rate of pay" for all hours that the employee works over forty hours in a seven-day week.  N.M.S.A. § 50-4-22.  Such provisions advance two public policies:

> (1) to establish minimum wage and overtime compensation standards for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage and overtime compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living.

N.M.S.A. § 50-4-19(D).  To succeed on a NMMWA overtime compensation claim, a plaintiff must establish: "(a) they worked more than forty hours a week, (b) that management knew or should have known that they did so, and (c) that they were not compensated for the overtime."  <u>Self v. United Parcel Serv., Inc.</u>, 1998-NMSC-046, ¶ 15, 126 N.M. 396, 403, 970 P.2d 582, 589.

For the NMMWA's purposes, the term "employer" "includes any individual, partnership, association, corporation, business trust, legal representative or any organized group of persons employing one or more employees at any one time, acting directly or indirectly in the interest of an employer in relation to an employee."  N.M.S.A. § 50-4-21(B).  "Employee" means "an

individual employed by an employer," N.M.S.A. § 50-4-2(C), but excludes "forepersons, superintendents and supervisors," N.M.S.A. § 50-4-21(C)(1).  When interpreting the NMMWA, the Supreme Court of New Mexico has considered law interpreting FLSA to be persuasive.  See Valentine v. Bank of Albuquerque, 1985-NMSC-033, ¶ 4, 103 N.M. 489, 490, 697 P.2d 489, 490 (conflating analyses of the NMMWA and the FLSA, and citing law on the FLSA); see also Corman v. JWS of New Mexico, Inc., 356 F. Supp. 3d 1148, 1160 (D.N.M. 2018).

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court."  Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]."  Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court."  Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[7]  If the Court finds only an

---

[7]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[8]   The Court may also rely on

---

before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[8]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.  It is true that in that

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[9]  Ultimately, "the Court's task is to predict what the

> case an intermediate appellate court of the State had determined the immediate
> question as between the same parties in a prior suit, and the highest state court had
> refused to review the lower court's decision, but we set forth the broader principle
> as applicable to the decision of an intermediate court, in the absence of a decision
> by the highest court, whether the question is one of statute or common law.
>
>    . . . .
>
> We have held that the decision of the Supreme Court upon the construction
> of a state statute should be followed in the absence of an expression of a
> countervailing view by the State's highest court, and we think that the decisions of
> the Court of Chancery [the New Jersey trial court] are entitled to like respect as
> announcing the law of the State.
>
>    . . . .
>
> The question has practical aspects of great importance in the proper
> administration of justice in the federal courts.  It is inadmissible that there should
> be one rule of state law for litigants in the state courts and another rule for litigants
> who bring the same question before the federal courts owing to the circumstance of
> diversity of citizenship.  In the absence of any contrary showing, the rule [set forth
> by two New Jersey trial courts, but no appellate courts] appears to be the one which
> would be applied in litigation in the state court, and whether believed to be sound
> or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The
Supreme Court has softened this position over the years; federal courts are no longer bound by
state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the
highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at
465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of
intermediate state appellate courts usually must be followed . . . [and] federal courts should give
some weight to state trial courts decisions." (emphasis and title case omitted)).

    [9]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather
than their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court toward according Tenth Circuit precedent less weight and according
state court decisions issued in the ensuing years more weight.  On the other hand, when the state
law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same

district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the

opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is *x*.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  <u>Moore's Federal Practice</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  (citation and internal quotation marks omitted))).  This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  <u>See</u> <u>Allstate Ins. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by

influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley

v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.).

## ANALYSIS

CoreCivic Tennessee argues that the Court should transfer this case to the Middle District

of Tennessee, because: (i) the first-to-file rule gives priority to the Middle District of Tennessee's

exercise of jurisdiction, see Supporting Brief at 5; and (ii) the 28 U.S.C. § 1404 factors neither

apply nor counsel against transfer, see Reply at 2-3.   The Court disagrees with CoreCivic

Tennessee's arguments and concludes: (i) that the first-to-file rule does not give jurisdictional

priority to the Middle District of Tennessee, because this case's parties and claims are different

---

required to prove a safer, feasible alternative design, we are bound to follow the
rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case
interpreting an issue of Utah law], as was the district court. "Following the doctrine
of stare decisis, one panel of this court must follow a prior panel's interpretation of
state law, absent a supervening declaration to the contrary by that state's courts or
an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at
1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.
Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest
court.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).
The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court
is bound to abide by the Tenth Circuit's interpretation of Erie.

than <u>Ballard</u>'s parties and claims; and (ii) that 28 U.S.C. § 1404 does not strongly favor transfer, because Jim chose to file this case in the District of New Mexico, and CoreCivic Tennessee does business in New Mexico.  The Court, therefore, will deny the Motion and will not transfer this case.

**I.      THE FIRST-TO-FILE RULE DOES NOT GIVE JURISDICTIONAL PRIORITY TO THE MIDDLE DISTRICT OF TENNESSEE.**

CoreCivic Tennessee argues that the first-to-file rule supports transferring this case to the Middle District of Tennessee.  <u>See</u> Motion at 1; Supporting Brief at 5-12.  According to CoreCivic Tennessee, this case satisfies all three of the first-to-file rule's considerations.  <u>See</u> Supporting Brief at 7.  Jim argues that this case does not satisfy any of the first-to-file rule's three considerations.  <u>See</u> Response at 3-8.

The first-to-file rule applies when two arguably related federal suits are pending simultaneously.  <u>See</u> <u>Wakaya Perfection</u>, 910 F.3d at 1124.  Under the first-to-file rule, courts consider three factors: (i) the events' chronology; (ii) the parties' similarity; and (iii) the claims or issues' similarity.  <u>See</u> <u>Wakaya Perfection</u>, 910 F.3d at 1124.  These three factors are not exhaustive, however, and "other equitable factors may bear on the inquiry."  <u>Wakaya Perfection</u>, 910 F.3d at 1124.  Because the decision to transfer hinges on the degree of the cases' similarity, the first-to-file rule is not a "rigid mechanical solution."  <u>Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.</u>, 342 U.S. 180, 183 (1952).  Moreover, the first-to-file rule is a "general rule" and not a strict one.  <u>Hospah Coal Co. v. Chaco Energy Co.</u>, 673 F.2d 1161, 1163 (10th Cir. 1982).  The Tenth Circuit states that the first-to-file rule is a "baseline," because the "first court to acquire jurisdiction may not be ideally suited to decide the merits."  <u>Wakaya Perfection</u>, 910 F.3d at 1124.

First, chronology favors transferring this case to the Middle District of Tennessee.  Because jurisdiction "relates back to the filing of the complaint," <u>Hospah Coal Co. v. Chaco Energy Co.</u>,

673 F.2d at 1163, determining chronology "typically requires only a comparison of" the filing dates of the two complaints, Wakaya Perfection, 910 F.3d at 1124.  The consolidated Ballard case was filed in the Middle District of Tennessee on May 15, 2020.  See Ballard Complaint at 2.  This case was filed on June 25, 2020.  See Complaint at 1.  Without any comparison of the parties, claims, or issues in the two cases, therefore, chronology favors transfer.

Second, the parties' similarity does not favor transfer.  For a court to transfer a case, the parties do not need to be "perfectly identical," Baatz., 814 F.3d at 790, but there must be "substantial overlap," Wakaya Perfection, 910 F.3d at 1126.  CoreCivic Tennessee is the defendant in both cases.  See Ballard Complaint at 2; Complaint ¶ 1, at 1.  Although it is not clear from the parties' briefs, Jim stated at the December 22, 2020, hearing that he is "going to define our class in this case to specifically exclude anybody who opted in to the Ballard case."  Tr. at 26:2-5 (Foty).  When the Court followed up later in the hearing and asked if it can "take to the bank and put in my opinion that there will not be people litigating in both cases," Tr. at 27:21-23 (Court), Jim stated: "That is correct, Your Honor, you can do that," Tr. at 38:5-6 (Foty).  Because, therefore, Ballard's plaintiffs and this case's plaintiffs do not or will not overlap, the parties do not substantially overlap.

Third, the claims or issues' similarity does not favor transfer.  Here, too, there must be "substantial overlap" in the issues or claims to weigh in favor of transfer.  Wakaya Perfection, 910 F.3d at 1126.  The issues must be substantially similar only in that they "seek like forms of relief and hinge on the outcome of the same legal/factual issues."  Shannon's Rainbow, LLC v. Supernova Media, Inc., 683 F. Supp. 2d 1261, 1279 (D. Utah Jan. 26, 2010)(Stewart, J.).  See Coffin v. Magellan, HRSC, Inc., No. CIV 20-0144 JB/GJF, 2021 WL 2589732, at *17 (D.N.M. June 24, 2021)(Browning, J.).  Although both Ballard and this case deal with the same factual issue

-- namely, the time that CoreCivic Tennessee correctional and detention officers spend undergoing security checks before they are allowed to clock into work at CoreCivic Tennessee facilities -- they hinge on different legal issues' outcomes.  Ballard contends that CoreCivic Tennessee violates the FLSA and Ohio's overtime compensation statute, Ohio Rev. Code Ann. § 4111.03.  See Ballard Complaint ¶ 1, at 2.  In this case, Jim alleges that CoreCivic Tennessee violated the New Mexico Minimum Wage Act, N.M.S.A. § 50-4-22(D), breached its employment contracts with its employees, withheld the reasonable value of services (quantum meruit), and were unjustly enriched.  See Complaint ¶¶ 35-54, at 6-8.

CoreCivic Tennessee contends that the differences in claims between this case and Ballard does not affect the first-to-file rule's analysis.  See Supporting Brief at 10.  CoreCivic's argument relies entirely on the analysis of Judge Nancy Freudenthal, United States District Judge for the District of Wyoming, in Meador v. QES Wireline, LLC, 2018 WL 6164430, at *4.  See Supporting Brief at 10.  In Meador v. QES Wireline, LLC, the question was whether a group of engineers' claims against their employer, a company that "provides wireline and other oilfield services to oil and gas industry customers," for violating the NMMWA, N.M.S.A. § 50-4-22(D) -- the same statute at issue here -- substantially overlapped with a separate suit's claims that alleged the same company violated the FLSA.  See Meador v. QES Wireline, LLC, 2018 WL 6164430, at *1, 4.  Judge Freudenthal concluded that the two suits' issues are sufficiently similar to permit transfer, because the two issues "require the same findings of fact."  2018 WL 6164430, at *4.

Even if Judge Freudenthal's analysis bound the Court, the differences between this case's claims and Ballard's is greater than the difference between the two cases at issue in Meador v. QES Wireline, LLC, 2018 WL 6164430, at *1.  Not only does Jim allege a NMMWA violation, but Jim also includes State common-law claims.  See Complaint ¶¶ 35-54, at 6-8.  In addition,

Judge Freudenthal did not account for an important difference between the FLSA and a N.M.S.A. § 50-4-22(D): the portal-to-portal provision.  28 U.S.C. § 254 states specifically that employers are not liable under the FLSA as amended for failure to pay minimum wage or overtime compensation for: (i) "walking, riding, or traveling to and from the actual place or performance of the principal activity or activities which such employee is employed to perform"; and (ii) "activities which are preliminary to or postliminary to said principal activity or activities," when those activities occur either before or after the "principal activity."  28 U.S.C. § 254(a). There is no similar compensation limitation under N.M.S.A. § 50-4-22(D).  See Segura v. J.W. Drilling, Inc., 2015-NMCA-085, ¶ 9, 355 P.3d 845, 848[10] ("Here, the exclusions in the Portal-to-Portal Act are completely absent from [N.M.S.A. § 50-4-22(D)].").

Judge Freudenthal concluded that two cases that "require the same findings of fact" have "sufficiently similar" issues to warrant transfer.  Meador v. QES Wireline, LLC, 2018 WL 6164430, at *4.  Even if the difference between Jim's claims and Ballard's claims were no greater than the difference between the claims in the two cases in Meador v. QES Wireline, LLC, 2018 WL 6164430, at *4, it would not solve the problem that there is no overlap in legal issues.  The Court does not agree with Judge Freudenthal's reasoning in Meador v. QES Wireline, LLC, 2018 WL 6164430, at *4, insofar as it concludes that claims that have the "same findings of fact," even if they arise under separate statutes or bodies of law, are sufficiently similar always to favor transfer.  Although the Tenth Circuit's directive is disjunctive -- a court should consider whether there is substantial overlap in the "issues or claims" -- the first-to-file rule is permissive, not a

---

[10]The Court predicts that the Supreme Court of New Mexico would agree with the New Mexico Court of Appeal's conclusion that there is no New Mexico equivalent to the Portal-to-Portal Act, because there is no provision in N.M.S.A. § 50-4-22(D) stating or otherwise indicating that employers are not liable for failure to compensate employees for traveling to and from work. See N.M.S.A. § 50-4-22(D).

requirement.  Wakaya Perfection, 910 F.3d at 1126 (emphasis added).  See Buzas Baseball v. Bd.
of Regents of Univ. Sys. of Ga., 189 F.3d 477 (table), at *2 (10th Cir. 1999).  The Court is not
persuaded that two cases requiring the same factual findings is sufficient always to overcome a
plaintiff's forum choice and choice of legal claims.  See Emps. Mut. Cas. Co. v. Bartile Roofs,
Inc., 618 F.3d 1153, 1167 (10th Cir. 2010)("The plaintiff's choice of forum weighs against
transfer."); William A. Smith Contracting Co., Inc. v. Travelers Indem. Co., 467 F.2d 662, 664
(10th Cir. 1972)("Unless the balance is strongly in favor of the movant the plaintiff's choice of
forum should rarely be disturbed.").  Jim's claims against CoreCivic Tennessee, therefore, do not
substantially overlap with the claims in Ballard.  Because the plaintiffs do not overlap, and the
issues or claims are not substantially similar, the two cases are "not so similar that [they] would
cause duplicative efforts." Abraham v. WPX Energy Productions, LLC, 2016 WL 548251, at *19.

## II.   THE 28 U.S.C. § 1404 FACTORS DO NOT STRONGLY FAVOR TRANSFER.

CoreCivic Tennessee argues that the first-to-file rule and not the transfer-of-venue statute,
28 U.S.C. § 1404(a), applies.  See Reply at 2-3.  CoreCivic Tennessee asks the Court to "wholly
disregard[]" Jim's contention that a court must consider both the first-to-file rule and 28 U.S.C.
§ 1404(a) when considering transferring a case.  Reply at 6.  Neither Jim nor CoreCivic Tennessee
is correct.  When applicable, the first-to-file rule and 28 U.S.C. § 1404(a) offer alternative grounds
for a court to transfer a case to a more convenient or appropriate district.  See In re Bozic, 888 F.3d
1048, 1054 (9th Cir. 2018)("Defendants also contend that the first-to-file rule negates § 1404(a)'s
requirement that an action may be transferred to only a district where it 'might have been brought.'
We disagree."); In re SK hynix Inc., 847 F. App'x 847, 853-54 (Fed. Cir. 2021)(concluding that
28 U.S.C. § 1404(a) does not displace the first-to-file rule, but that there is no "legal right under

the first-to-file rule to compel a transfer between federal forums when § 1404(a)'s threshold conditions are not met").

Importantly, the first-to-file rule does not displace 28 U.S.C. § 1404(a)'s requirement that the transferee district be a proper venue.  See In re Bozic, 888 F.3d at 1054; 15 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3845, at n.18 (4th ed., April 2021 Update).  In other words, for a court to transfer a case pursuant to the first-to-file rule, the transferee court must be a proper venue.  See Van Dusen v. Barrack, 376 U.S. 612, 616 (1964)(noting that the "transfer power is . . . expressly limited by the final clause of § 1404(a) restricting transfer to those federal district courts in which the action 'might have been brought'")(quoting 28 U.S.C. § 1404(a)); In re SK hynix Inc., 847 F. App'x at 853 ("A contrary understanding of the interaction between the first-to-file rule and § 1404(a) would allow a judge-made doctrine to contravene a congressionally enacted statute . . . ."); In re Bozic, 888 F.3d at 1054.  Consequently, a court may transfer a case pursuant either to the first-to-file rule or to the § 1404(a) factors, but the transferee court must, in both instances, be in a district where the case "might have been brought" or "to which all parties have consented."  28 U.S.C. § 1404(a).

Here, although the first-to-file rule does not favor transfer -- it does not give jurisdictional priority to the Middle District of Tennessee -- see Analysis § 1, supra, the Court still may transfer the case to the Middle District of Tennessee pursuant to 28 U.S.C. § 1404(a), because the case could have been brought in the Middle District of Tennessee, where CoreCivic Tennessee has its headquarters.  See 28 U.S.C. § 1391.  Section § 1404(a) states: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Section 1404(a) affords a district court broad discretion to adjudicate motions to transfer based on a case-by-case

review of convenience and fairness.  See Chrysler Credit Corp., 928 F.2d at 1516.  In considering

whether to transfer a case, a court should consider

> the plaintiff's choice of forum; the accessibility of witnesses and other sources of
> proof, including the availability of compulsory process to insure attendance of
> witnesses; the cost of making the necessary proof; questions as to the enforceability
> of a judgment if one is obtained; relative advantages and obstacles to a fair trial;
> difficulties that may arise from congested dockets; the possibility of the existence
> of questions arising in the area of conflict of laws; the advantage of having a local
> court determine questions of local law; and, all other considerations of a practical
> nature that make a trial easy, expeditious and economical.

Emps. Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1167 (quoting Chrysler Credit Corp., 928

F.2d at 1516).

CoreCivic Tennessee contends that, in Meador v. QES Wireline, LLC, 2018 WL 6164430,

at *4, Judge Freudenthal "did not conflate the two alternative grounds for allowing it to decline to

exercise jurisdiction," that is, the first-to-file rule and 28 U.S.C. § 1404(a).  Reply at 2.  CoreCivic

Tennessee appears to acknowledge, therefore, that the first-to-file rule and 28 U.S.C. § 1404(a)

offer alternative grounds for transfer -- provided the transferee venue is proper, of course.  In its

briefs, CoreCivic Tennessee does not argue that the case should be transferred pursuant to

28 U.S.C. § 1404(a).  See Motion at 1-3; Supporting Brief at 1-13; Reply at 1-13.  Rather,

CoreCivic Tennessee maintains that Jim's discussion of the 28 U.S.C. § 1404(a) factors is

"irrelevant."  Reply at 2.  At the hearing, however, CoreCivic Tennessee briefly addressed the

28 U.S.C. § 1404(a) factors.  See Tr. at 14:17-17:13 (Pritchard).  The extent of CoreCivic

Tennessee's argument that the 28 U.S.C. § 1404(a) factors favor transfer includes: (i) that

CoreCivic Tennessee "would respect" Jim's decision to pursue an individual claim New Mexico,

Tr. at 15:2-3 (Pritchard), but that the "dynamic shifts" when he brings the claim on behalf of a

class, Tr. at 15:13-14 (Pritchard); (ii) most of the testimony is "going to come from operational

witnesses are in Nashville," Tr. at 15:20-21 (Pritchard); (iii) Jim admits that it would "make sense

to have the litigation in one place," Tr. at 16:1 (Pritchard); and (iv) the District of New Mexico's docket is no more congested than the Middle District of Tennessee's, but that transferring this case would mean a "reduction in burden on the judiciary overall," Tr. at 16:22-23 (Pritchard).

The Tenth Circuit states that a party moving to transfer a case pursuant to 28 U.S.C. § 1404(a) "bears the burden of establishing that the existing forum is inconvenient." Chrysler Credit Corp., 928 F.2d at 1515. A plaintiff's choice of forum should "rarely be disturbed," unless the "balance is strongly in favor of the movant." William A. Smith Contracting Co., Inc. v. Travelers Indem. Co., 467 F.2d at 664. "Merely shifting the inconvenience from one side to the other, however, obviously is not a permissible justification for a change of venue." Scheidt v. Klein, 956 F.2d 963, 965 (10th Cir. 1992).

The 28 U.S.C. § 1404(a) factors do not favor transferring this case to the Middle District of Tennessee. Jim filed this case in the District of New Mexico alleging violations that occurred in New Mexico. See Complaint ¶ 4, at 2; Response at 10. CoreCivic Tennessee does business in New Mexico, which weighs against transfer. See Emps. Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1167; United States ex rel. Browning Minn. Tank Co. v. Kinley Const. Co., 816 F. Supp. 2d 1139, 1149 (D.N.M. 2011)(Browning, J.). See also Tr. at 3:5-8 ("It seems to me that a corporation can be sued in a lot of states, all 50 states, and maybe more, and they bring state law claims against a defendant and they've just got to deal with it.")(Court). There is no sound reason to conclude that, overall, witnesses are more accessible in Tennessee than in New Mexico. CoreCivic Tennessee does not argue that it would be more expensive to make the necessary proof in New Mexico than it would be in Tennessee. Finally, any administrative costs that the judiciary would save by transferring this case are either speculative or, at best, negligible. CoreCivic Tennessee, therefore, does not meet its burden to demonstrate that the District of New Mexico is

an inconvenient forum.  See Chrysler Credit Corp., 928 F.2d at 1515.  Because Jim's choice of

forum is entitled to deference, the District of New Mexico is not an improper venue.  See Emps.

Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1167.

      **IT IS ORDERED** that the Defendant's Motion to Transfer, filed November 16, 2020 (Doc.

26), is denied.

 

 

                                    UNITED STATES DISTRICT JUDGE

*Counsel:*

Anthony J. Lazzaro
Chastity Christy
Lori Griffin
The Lazzaro Law Firm, L.L.C.
Moreland Hills, Ohio

-- and --

Hans Nilges
Nilges Draher, L.L.C.
Massillon, Ohio

-- and --

Don Foty
Hodges & Foty, L.L.P.
Houston, Texas

     *Attorneys for the Plaintiffs*

Christian Angotti
Robert W. Pritchard
Littler Mendelson, P.C.
Pittsburgh, Pennsylvania

-- and --

Robert Shawn Oller
Littler Mendelson, P.C.
Phoenix, Arizona

*Attorneys for the Defendant*